UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| PRESCHOOL DEVELOPMENT, LTD., | : | |
| | : | NO. 1:04-CV-00348 |
| Plaintiff, | : | |
| | : | **OPINION & ORDER** |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CITY OF SPRINGBORO, OHIO | : | |
| | : | |
| Defendant. | : | |

The Parties have filed Cross-Motions for Summary Judgment in this matter (docs 18 and 24). Plaintiff Preschool Development, Ltd. (hereinafter "Preschool") filed its Motion for Summary Judgment on January 20, 2005. Defendant City of Springboro (hereinafter "Springboro") filed its Motion for Summary Judgment on January 25, 2005 (doc. 24). Both Parties filed Memoranda in Opposition to the other's Motion for Summary Judgment (docs. 37 and 43) as well as Reply Memoranda in Support of their respective Motions (docs. 46 and 47). The Court held a Hearing on April 7, 2005 regarding each Parties' Motion for Summary Judgment. At the conclusion of the Hearing, the Court Ordered the Parties to file Post-Hearing Briefs (doc. 59). The Parties subsequently filed the requested Post-Hearing Briefs (docs. 63 and 64). The Court's Opinion and Order regarding the Cross-Motions for Summary Judgment follows.

**FACTS & PROCEDURAL HISTORY**

    The facts in this matter are not largely in dispute. Rather, the legal impact these facts bear is disputed.  Preschool owned approximately 2.6 acres of land and certain improvements located along State Route 73 in Springboro, Ohio (doc. 1). Preschool operated a "Goddard School" which is a for-profit child daycare and preschool on the property (doc. 18).  Prior to July 19, 2002 Preschool enjoyed a curb-cut (hereinafter the "Curb-Cut") and driveway apron providing access directly from State Route 73 to Preschool's property (Id.).  During the night hours of July 19, 2002, Springboro eliminated the Curb-Cut by installing a four-inch tall curb preventing vehicular traffic from directly entering or exiting Preschool's property (Id.).

    The elimination of the Curb-Cut was done without notice to Preschool.  Springboro notes that this was done at night because that is when it was safest to work on State Route 73 and does not indicate any attempt at concealment on their part. Preschool alleges the Curb-Cut was eliminated at night to prevent it from seeking a court's intervention to stop the elimination. Springboro contends that this elimination of Preschool's Curb-Cut was done for safety reasons (doc. 24).  Patrons of Preschool can still access the property via an easement (hereinafter the "Easement") across the neighboring shopping center approximately 200 feet from Preschool's former Curb-Cut (Id.).  The legal effect

or characteristics of the Easement are hotly disputed by the Parties. The quality of the Easement is discussed in detail further within the Court's Order.

Also of importance in this dispute is a development agreement (hereinafter "Development Agreement") entered into between Preschool and Springboro (docs. 18 and 24). Prior to the issuance of building permits for the construction on Preschool's property, Springboro raised certain objections to the existence and configuration of the Curb-Cut (doc. 18). Consequently, the Parties entered into the Development Agreement on January 11, 1999 (doc. 18). The terms and subsequent obligations of the Development Agreement are also hotly disputed. Additionally, the Parties engaged in a series of phone calls and correspondence in 2002 (doc. 24). Particularly, these communications involved Preschool's counsel and Michael C. Eckert (hereinafter "Eckert"), a partner in the law firm of Roger C. Eckert, Law Director for Springboro (Id.). Preschool views these communications as a "forbearance agreement" (hereinafter "Forbearance Agreement") in which Springboro agreed not to eliminate the Curb-Cut (Id.). Springboro avers that these communications have no legal binding effect (Id.). The Court will address in more detail below the Development Agreement and Forbearance Agreement.

On May 20, 2004 Preschool filed its Complaint in

-3-

this Court against Springboro (doc. 1).  In its Complaint, Preschool alleges that Springboro eliminated the Curb-Cut without due process and without paying Preschool just compensation for said elimination in violation of the Fifth and Fourteenth Amendments to the Constitution (doc. 1).  Preschool also brought a breach of contract claim alleging Springboro's actions breached both the Development Agreement and Forbearance Agreement (Id.).  Lastly, Preschool claimed that Springboro violated the "Contract Clause" of the United States Constitution through and by its breach of the Development and Forbearance Agreements (Id.).

Of paramount importance in addressing the Parties' arguments is the potentially preclusive impact of Preschool's earlier action for a writ of mandamus in the Ohio Supreme Court to compel Springboro to bring an appropriation action under section 2731.01 of the Ohio Revised Code for the elimination of the Curb-Cut.  See State ex rel. Preschool Development, Ltd. v. Springboro, 792 N.E.2d 721 (Ohio 2003).  Preschool filed its action for a writ in October of 2002.  The Ohio Supreme Court denied the issuance of the writ.  Id. at 725.  As noted, this ruling plays an integral part in the Court's decision.  It will be more fully addressed below.

**APPLICABLE LEGAL STANDARD**

The narrow question that this Court must decide on

−4−

a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

  The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case.  Id. at 321; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); see Guarino, 980 F.2d at 405.

  As the Supreme Court stated in Celotex, the non-moving party must "designate" specific facts showing there is a genuine issue for trial.  Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.  Although the burden might not require the non-moving party to "designate" facts by citing page numbers, "'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which

the non-moving party relies.'" <u>Guarino</u>, 980 F.2d at 405 (quoting <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), <u>cert.</u> <u>denied</u>, 494 U.S. 1091 (1990).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1162 (6th Cir. 1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. <u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-55 (6th Cir. 1991).

**ANALYSIS**

**A. The Effect of the Ohio Supreme Court's Denial for Writ of Mandamus (<u>See</u> <u>State ex rel Preschool Development, Ltd. v. Springboro</u>, 792 N.E.2d 721 (Ohio 2003)**

Springboro maintains that the Ohio Supreme Court's decision denying a writ of mandamus (hereinafter "State Decision") is preclusive on this Court's decision (doc. 24). That preclusive effect is categorized by Springboro as one of "issue preclusion" (doc. 46). The State Decision found that Preschool was not entitled to a writ of mandamus to compel Springboro, pursuant to

Chapter 163 of the Ohio Revised Code, to commence appropriation proceedings. <u>Preschool Development</u> at 724.

The Supreme Court has noted, "it is now settled that

-6-

a federal court must give to a state-court judgment the same preclusive effect as would be given judgment under the law of the State in which the judgment was rendered." Migra v. Warren City Sch. Dist., 465 U.S. 75, 81 (1984). In Ohio, issue preclusion, also known as collateral estoppel, "precludes the relitigation of an issue that has been 'actually and necessarily litigated and determined in a prior action.'" Krahn v. Kinney, 538 N.E.2d 1058, 1062 (Ohio 1989), quoting Goodson v. McDonough Power Equip., Inc., 443 N.E.2d 978, 981 (Ohio 1983). Springboro, as noted above, argues that the State Decision has already "litigated and determined" the issues in the case (doc. 24). Preschool avers that it never mentioned the Fifth Amendment in its mandamus complaint at the State Decision level (doc. 47). Neither party, maintains Preschool, engaged in any analysis of the Fifth Amendment at the State Decision level and the State Decision mentions the Fifth Amendment once, only in passing (Id.).

The Court turns to several Sixth Circuit opinions as well as district court cases from Ohio and Michigan in finding whether issue preclusion bars this Court from considering Preschool's takings claim. The Sixth Circuit opinions are: Kruse v. Village of Chagrin Falls, 74 F.3d 694 (6th Cir. 1996), Buckles v. Columbus Mun. Airport Auth., 90 Fed. Appx. 927, 2004 WL 364046 (6th Cir. (Ohio) 2004), and DLX, Inc. v. Kentucky, 381 F.3d 511, 519-21 (6th Cir. 2004). In Buckles, the plaintiff was the owner of a 122-acre tract of land near the Columbus, Ohio airport. Buckles at *1. The plaintiff alleged that the Airport Authority's actions

-7-

over the preceding fifteen years "cumulatively deprived him of all economically viable use of" his land. Id.

The Airport Authority had listed plaintiff's land in its master plan (since 1985) as property it desired to acquire. Id. In 1997, the Airport Authority began efforts to acquire the property and in 1998 it initiated appropriation proceedings in Ohio state court to acquire the land through condemnation. Id. Ultimately, the jury found that the property was worth $13 million. Id. As a result of the high value given to the property by the jury, the Airport Authority abandoned its appropriation of the property. Id. Subsequently, however, the Airport Authority publicly stated its intention to continue its attempts to acquire the property. Id. The plaintiff filed his action in federal court asserting that the Airport Authority's "conduct was part of an ongoing effort . . . to take [his property] on the cheap, and which had the effect of depriving him indefinitely of all reasonably economically viable use of" his property. Id.

The Buckles Court noted that the "Supreme Court has held that a taking claim is not ripe for judicial review until the state has refused to pay for the property it took." Id at *2 citing Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194-95 (1985). Additionally, Buckles noted that a state is not required to "pay in advance" for property taken so long as the state makes accessible a "reasonable, certain and adequate provision for obtaining compensation." Id. quoting Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 124-25

-8-

(1974). Furthermore, the claim for a taking does not become ripe "until the claimant has attempted to use this 'adequate procedure' and has been rebuffed." Id. quoting Blanchette at 124-25.

In Kruse, the Sixth Circuit held that Ohio's mandamus procedure for obtaining relief after private property is taken by the state does not afford a "reasonable, certain and adequate provision for obtaining compensation." Kruse at 700. Buckles analyzing Kruse stated, "Ohio mandamus [is] by definition not an adequate provision for obtaining just compensation following a physical taking, because mandamus is available only when there is no adequate remedy at law or equity." Buckles at *2. Ultimately, in Buckles the Sixth Circuit found that the plaintiff had not exhausted the "state process to seek just compensation for the taking . . . [and;] therefore[, the plaintiff's] taking claim is unripe and this court has no jurisdiction over it as yet." Buckles at *3.

The immediately preceding quotation from Buckles ends with a footnote. This footnote provides this Court with a clear understanding of what, if any, preclusive effect the State Decision has in this matter. The footnote reads:

> It may seem paradoxical and perhaps even
> unfair that as soon as a Takings Clause claim
> is ripe, further action is issue-precluded by
> the very state proceeding necessary for
> ripeness. Although frustrating to a litigant
> who seeks a federal forum, this result does
> not seem to be mandated by Williamson County.
> Williamson County may not completely bar

–9–

> takings claims from the lower federal courts,
> however: a state court's denial of just
> compensation for an already-accomplished
> taking would present a ripe claim. And there
> would be no claim preclusion, because the
> Takings Clause claim would not have been ripe
> at the time of the state court proceeding.

<u>Buckles</u> at 3.

The Sixth Circuit has opined in a decision issued

after <u>Buckles</u> that

> The availability of federal courts to hear
> federal constitutional takings claims has
> often seemed illusory, because under
> <u>Williamson County</u> takings plaintiffs must
> first file in state court . . . before filing
> a federal claim, and because in deciding that
> federal claim, preclusive effect must be given
> to that prior state-court action . . .
> <u>Williamson County's</u> ripeness requirements and
> the doctrine of claim preclusion could
> possibly operate to keep every regulatory-
> takings claimant out of federal court . . .
> [e]ven if only issue preclusion is held to be
> operative against plaintiffs who ripen under
> <u>Williamson County</u>, most plaintiffs could still
> be barred from the federal courthouse, as the
> state constitutional takings claim will
> overlap substantially with the federal claim .
> . . reading <u>Williamson County</u>, the expectation
> is that an unsuccessful state plaintiff will .
> . . return to federal court

<u>DLX, Inc. v. Kentucky</u>, 381 F.3d 511, 519-21 (6th Cir. 2004). <u>DLX</u>

further notes that unequivocally a state takings claim and a

federal takings claim are not "identical in both 'subject matter'

and 'cause of action' for the purposes of claim-preclusion law"

where the "procedures offered by the state are clearly inadequate.

<u>DLX</u> at 521 <u>citing</u> <u>Kruse</u> at 698-700.

Additionally, the Northern District of Ohio in a

-10-

January 2005 opinion stated, ". . . if there is an adequate procedure available for a property owner to seek just compensation, a Takings Clause claim will not be ripe for federal court review until the owner has tried the state procedure and failed." Coles v. Granville, No. 03-CV-7595, 2005 WL 139137 (N.D. Ohio, Jan. 24, 2005).  In Coles, Judge Carr declined to find the claim ripe as the plaintiffs had not applied for a writ of mandamus.  Additionally, in Coles, defendant argued that the court could not decide because of the Rooker-Feldman doctrine.  Id.  The Coles Court determined that indeed the Rooker-Feldman doctrine applied; and, consequently, the court abstained from exercising jurisdiction over the matter. Id. at *4.  However, as noted above, since  Williamson County "clearly contemplates that after a state just-compensation proceeding, a federal-court action will be filed[,] . . . Rooker-Feldman is inapplicable . . ." Van Wulfen v. Montgomery County, 345 F.Supp.2d 730 (E.D. Mich. 2004) quoting DLX at 517.

The Court finds the reasoning in Kruse, Buckles, DLX, Coles, and Van Wulfen sound.  Preschool has alleged that Springboro "already-accomplished" a taking by removing the Curb-Cut.  Preschool then requested a writ of mandamus to compel Springboro to institute appropriation proceedings.  The Ohio Supreme Court denied the writ and that denial provided a ripe claim for this Court to review.  Preschool used this "adequate remedy" and was "rebuffed."  As such, issue preclusion does not apply since the federal Takings Clause claim "would not have been ripe at the time of the state court proceeding."  Furthermore, Kruse has held

that the Ohio mandamus procedure does not provide an adequate remedy and DLX has held that a state takings claim and a federal takings claim are not identical where the "procedures offered by the state are clearly inadequate." DLX at 521 citing Kruse at 698-700.  Accordingly, one can find the State Decision not preclusive using the express language of Buckles and DLX (quoted above).  Still, one can also find the State Decision not preclusive by relying upon the holding in Kruse which finds Ohio's mandamus procedure inadequate, rendering the state and federal takings claims distinct.

Additionally, the Court notes that the grant of a writ of mandamus is an extraordinary remedy.  See e.g., Califano v. Moynahan, 596 F.2d 1320 (6th Cir. 1979).  The denial of the writ is not equivalent to a determination that the arguments underlying the writ lack merit.  As such, the Court also finds this as cause to conclude the State Decision has no preclusive effect.

### B. Preschool's Argument that Removal of the Curb-Cut and Installation of the Curb Amount to an Unconstitutional Taking

Having determined that the State Decision does not preclude this Court from reviewing Preschool's Takings Clause claim, the Court now turns to the substance of said claim.  The Fifth Amendment to the United States Constitution provides, in pertinent part, that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V.  The protections afforded by the Fifth Amendment in relation to the

Takings Clause (also known as the Just Compensation Clause) has been extended to state actions via the Fourteenth Amendment.  <u>See</u> <u>e.g.</u>, <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419 (1982); <u>see also</u> <u>Chicago, Burlington & Quincy R.R. Co. v. Chicago</u>, 166 U.S. 226, 241 (1897) (holding the taking of private property for public use without just compensation violates "the due process of law required by the Fourteenth Amendment").

The Supreme Court recognizes two types of takings - regulatory and physical.  <u>D.A.B.E. Inc. v. City of Toledo</u>, 393 F.3d 692, 695 (6th Cir. 2005) <u>quoting</u> <u>Waste Mgmt. Inc. v. Metro. Gov't of Nashville</u>, 130 F.3d 731, 737 (6th Cir. 1997). A regulatory taking exists where "[a] statute regulating the uses that can be made of property . . . [effectively denies] an owner [of the] economically viable use of his land[ ]."  <u>D.A.B.E.</u> at 695.  It is clear that a regulatory taking is not present in the instant matter.

A physical taking occurs where "the government physically intrudes upon a plaintiff's property." <u>Waste Mgmt.</u> at 737.  Furthermore, if the government's intrusion is of a permanent nature, it is not important whether the economic impact on the plaintiff is slight nor whether the benefit to the public by the taking important.  <u>Id</u>.  Whenever a physical taking occurs, the landowner is entitled to just compensation regardless of the quantity or quality of the property possessed.  <u>Brown v. Legal Found. of Washington</u>, 538 U.S. 216, 233 (2003) (<u>internal citations omitted</u>).  Physical takings have been categorized as those that "single out" specific landowners.  <u>Lucas v. South Carolina Coastal</u>

-13-

Council, 505 U.S. 1003, 1073 (1992). Put another way, a physical
taking is effected by the government "where it requires the
landowner to submit to the physical occupation of his land." Yee
v. City of Escondido, 503 U.S. 519, 527 (1992).

Preschool contends that under Ohio law, a curb-cut
onto a street adjoining one's land "unquestionably is a right

enjoyed by a property owner" and that Springboro's removal of the
Curb-Cut and installation of a curb resulted in a taking and
physical occupation of land owned by Preschool (doc. 18).
Preschool avers that Ohio law "is crystal clear on the right of a
property owner to directly access public streets on which his
property abuts" and that its elimination is a taking for which just
compensation is required (Id.). Preschool cites McKay v. Kauer,
102 N.E.2d 703 (Ohio 1951) for this proposition. McKay states:

> Since an early day, has been the law of this state that
> an owner of real property has an easement in the public
> street on which his property abuts, as an appurtenance
> thereto; and that if a substantial change of grade in the
> street upon which the property abuts renders the
> buildings thereon less convenient of access there is an
> appropriation *pro tanto* of the property right in the
> easement for which compensation may be required.

McKay at 705. McKay further stated:

> The owner of lots abutting upon a public street in a city
> or village has a peculiar interest in the street,
> distinct from the right of the public to use the street.
> It is a private property right in the nature of an
> incorporeal hereditament attached to his contiguous
> grounds and the erections thereon, without which his

-14-

property would be of comparative little value. The right
of access to the street for business purposes is of great
value.

Id. at 707.  And still McKay continues by noting:

Where the grade of a street constituting a part of a
state highway has been established and the owner of the
property abutting thereon has improved his property in
reliance upon and in conformity to such grade, and
thereafter a highway improvement is made upon such street
by the Director of Highways of the state in accordance
with legally approved plans and specifications whereby
the width of the street or highway is narrowed and the
grade of the remainder is substantially lowered from the
former grade to such extent that there is no physical
access to or from the property to the street, the owner
of such property suffers a 'taking' of his property and
is entitled to compensation by way of damages from the
state to the extent of his loss, even though no part of
the physical property is taken or disturbed.

Id. at 703-04.  Yet, another Ohio Supreme Court case cited by
Preschool stated, "[t]he owner of a lot abutting on a street has an
easement in the street appendant to his lots whereby he is entitled
to an unobstructed access to and from the street, and this
appendant easement is as much property as the lot itself."  Smith
v. Wayne County Bd. Of Comm'rs, 35 N.E. 796, 797 (Ohio 1893).
Preschool also notes that in 1996 this rationale was affirmed by
State ex rel. OTR v. City of Columbus, 667 N.E.2d 8 (1996).

Springboro argues that the Ohio cases that should be
controlling are not those cited by Preschool (doc. 37).  Springboro
argues that:

[M]ere circuitry of travel, necessarily and newly

-15-

created, to and from real property does not itself result
in legal impairment of the right of ingress and egress to
and from such property, where any resulting interference
is but an inconvenience shared in common with the general
public and is necessary in the public interest to make
travel safer and more efficient.

(Id. quoting State ex rel. Merrit v. Linzell, 126 N.E.2d 53 (Ohio

1955).  Springboro also quotes a portion of OTR which reads:

A properly authorized governmental unit has the power to
regulate, reasonably, in the public interest, and without
illegal discrimination, the extent of an abutter's
private right of access from his property to the highway
or street.  The cases hold or recognize, *however, that
such power of regulation does not extend to depriving an
abutting owner completely of all access to the street or
highway,* at least not without compensation therefor.

OTR at 13 (emphasis added by the Court).  Springboro ultimately

concedes that Preschool has aptly cited the law, yet disputes

Preschool's application of that law (doc. 37).

         Springboro notes that OTR and McKay are grade cases

(Id.).  Springboro maintains that "[t]he McKay holding is narrowly

predicated upon circumstances involving an initial street grade,

reliance upon that grade in making improvements to an abutting

property, and a subsequent, substantial change in the grade of the

street" (Id.).  In OTR, points out Springboro, the plaintiff was

prevented from "ever developing access" to what was the original

abutting street (Id. quoting OTR at 13).  Here, asserts Springboro,

Preschool still retains access to State Route 73 via the Easement

some 200 feet down the road (Id.).  There is no question that the

-16-

elimination of the Curb-Cut and installation of the four-inch curb did not involve a change in grade. These factual distinctions, argues Springboro, render the OTR and McKay cases useless in analyzing the matter currently before the Court (Id.).

More directly on point, insists Springboro, is the case of Noga v. Masheter, 330 N.E.2d 439 (Ohio 1975) as well as State ex rel. Merrit v. Linzell, 126 N.E.2d 53 (Ohio 1955). The OTR court described concisely the change of access that occurred in Noga:

> In Noga, the property at issue abutted U.S. Route 422 in Trumball County. The property owners had direct access from their property to the westbound lands of Route 422, but did not have direct access to the eastbound lanes because a divider separated the lanes of travel. In 1968, the state improved Route 422. As part of the improvement, the state widened the highway, constructed a curb barricade along the edge of the roadway fronting the property, and also constructed a service road providing the property owners with access to Route 422 at a distance of approximately 500 feet from the property.

OTR at 14. Sringboro latches onto the facts in Noga - namely, that a curb-cut was added in front of plaintiff's property and that plaintiffs, consequently, had to travel some 500 feet from their property to access the road (doc. 37). Springboro notes that the Noga court determined no taking had occurred (Id.).

The Court however is not convinced that Noga is controlling as regards the Curb-Cut and curb installation at issue in this matter. Preschool is correct in noting in both Merritt and

Noga that "only the *nature* of the street in front of [the plaintiffs'] property . . . changed" (doc. 18).  Specifically, in Noga, which Springboro relies so heavily upon, the public road abutting the plaintiffs' property became a service road which accessed the original abutting road (a service road that was, at least, still a public road).  OTR at 14 citing Noga.  In both Merritt and Noga, the property owners still had access to a public street in basically the same location as they always did.  See Merritt and Noga.  Preschool highlights that Merritt expressly reaffirmed the fundamental right to access the roadway abutting one's property as espoused in McKay stating:

> An owner of property abutting on a public highway possesses, as a matter of law, not only the right to use of the highway in common with other members of the public, but also a private right or easement for the purpose of ingress and egress to and from his property, which latter right may not be taken away or destroyed *or substantially impaired* without compensation therefor.

Merritt at 54 (emphasis added).

The Court finds that Springboro took without just compensation property of Preschool.  That property is Preschool's right, as established by Ohio law, to access the abutting State Route 73.  Although the Easement does provide access to Preschool's property, it is not a "mere circuitry of travel, necessarily and newly created."  It is a complete divestment of Preschool's right to access the abutting State Route 73.  That right may not be

-18-

destroyed or substantially impaired.  The elimination has deprived Preschool, an abutting owner to a public road, access to that public road.  There is no factual dispute between the parties that Springboro eliminated the Curb-Cut and that just compensation has not been paid for that elimination.  Furthermore, as analyzed above, in the absence of any disputes regarding material facts, Preschool is entitled to judgment as a matter of law.  As such, the Court grants Preschool's Motion for Summary Judgment as it pertains to whether a taking without just compensation occurred.  Therefore, what remains for a jury to determine is the amount of damages suffered by Preschool as a result of the taking.  In so granting Preschool's Motion for Summary Judgment on this issue, the Court denies Springboro's Motion for Summary Judgment based upon the argument that Preschool's takings claim is barred by issue preclusion and denies Springboro's Summary Judgment argument that the Court should dismiss Preschool's state law supplemental jurisdiction claims.  The Court now turns to the Parties' remaining arguments.

### C. Breach of the Development Agreement & Forbearance Agreement Claims

#### 1. Development Agreement

Springboro moves this Court to grant Summary Judgment in its favor as it relates to Preschool's claims that it breached the Development and Forbearance Agreements (doc. 24).  The

-19-

Development Agreement was entered into on January 9, 1999 (Id.).
The contractual dispute concerning the Development Agreement
centers around Section 2 of said agreement (Id.).  Section 2 deals
with ingress/egress to Preschool's property (Id.).  Section 2 reads
as follows:

> If the property is developed according to the Development
> Plan, then upon the completion of the improvements as set
> forth in the Development Plan, Owner may construct and
> maintain a driveway to provide access from State Route 73
> (SR 73) to its parking lot as shown on Exhibit A.  This
> driveway will be accessible by right and left turn from
> SR 73.  However, upon the occurrence of all of the
> following conditions:
>
>> a.  Twelve months have elapsed from the date of the
>> completion of the Development of the Property; and
>
>> b.  The property that adjoins the Property to the
>> east (the "Oberer Property"), has been developed as
>> shown on the attached Exhibit B, which includes a
>> Central Avenue entrance in the configuration and
>> location shown on Exhibit B; and
>
>> c.  City has caused the then-owner of the Oberer
>> Property to grant a perpetual easement to Owner, or
>> to the public, as the case may be, for vehicular
>> and pedestrian ingress and egress, with title that
>> is free, clear and unencumbered, across such
>> portions of the Oberer Property which are shown on
>> attached Exhibit C on such terms as are reasonably
>> acceptable to Owner and that do not contain any
>> obligation on the part of Owner to maintain, pay
>> for maintenance or to insure any portions of the
>> Oberer Property.
>
> the, the City may require that a median be built between
> the east-bound and west-bound lanes on SR 73 at Owner's
> reasonable expense to prevent left turns into the
> Property's original driveway if necessary for traffic

> safety as determined by the City in its sole discretion.
> In the event that such median is constructed, City will
> [be] responsible for initially landscaping the median and
> thereafter maintaining such landscaping.  City will also
> be solely responsible for maintenance and upkeep of the
> median and all repairs and replacement thereto from and
> after the initial construction.

(Id.).

It is not disputed by the Parties that Preschool developed the property according to the Development Plan and that Preschool constructed a driveway providing access from State Route 73 to its parking lot, and that the driveway was accessible by right and left turn from State Route 73 (Id.).  Nor is it in dispute that the Oberer property to the east of Preschool's property was developed with an entrance from Central Avenue (Id.). Furthermore, the Parties agree that the City obtained an easement across the Oberer property; yet, in dispute is the legal effect of that easement (Id.).  Both parties agree that this is a non-factual issue for the Court to decide.  Lastly, it is uncontroverted that Preschool did not construct a median between the eastbound and westbound lanes of State Route 73; although, Preschool questions the relevance of this fact.

The Development Agreement requires that there be a "perpetual easement to Owner, or to the public" (Id.).  Springboro first obtained an ingress/egress easement over the Oberer property accepted by the City Manager but not City Council (Id.).  To

address concerns raised by Preschool, Springboro obtained a second ingress/egress easement over the Oberer property which was formally accepted and ratified by City Council (Id.). The Development Agreement, notes Springboro, sets forth the conditions that the Easement should contain (Id.). Those conditions, avers Springboro, were met (Id.).  These conditions are:

1.  The Easement be a perpetual one to Preschool or to the public;

2.  The Easement be "for vehicular and pedestrian ingress and egress;"

3.  Title to the Easement shall be "free, clear, and unencumbered;" and

4.  Preschool shall have no obligation to maintain, pay for maintaining, or to ensure the Easement.

(Id.).

Springboro argues that condition 1, above, is met (Id.). The second ingress/egress easement accepted and ratified by City Council, maintains Springboro, "dedicates" a permanent perpetual easement to Springboro and the public at large across the Oberer property in order to access State Route 73 (Id.).  This, argues Springboro, renders the Easement a public easement and immediately vests interests in Preschool as an abutting property owner (Id.). As to the second condition, Springboro notes that the Easement instrument provides Springboro and the public at large

-22-

"perpetual right of vehicular and pedestrian access over the easement area" (Id.). Thus, avers Springboro, condition 2 is met. The third condition, that the Easement be free, clear, and unencumbered, is met, argues Springboro, because the Easement instrument states that it is "free and clear from all liens and encumbrances whatsoever, excepting those non-material restrictions set forth in an attachment to the Easement, encumbrances which do not prevent insurability and marketability of title" (Id.). Lastly, condition 4 is met, insists Springboro, as the Easement instrument provides that the owner of the Oberer propert "shall maintain the easement area in good repair" (Id.).

Consequently, Springboro, prior to the time that it closed the Curb-Cut, had obtained from the owner of the Oberer property an easement providing access to Preschool's property (Id.). Under the Development Agreement, after twelve months had elapsed from Preschool's development of its property, after the Oberer property had been developed, and after Springboro had obtained an easement, the Development Agreement provides that Springboro "may require that a median be built between the east-bound and west-bound lands on State Route 73 at [Preschool's] reasonable expense to prevent left turns into [Preschool's property's] original driveway if necessary for traffic safety as determined by . . . [Springboro] in its sole discretion" (Id.).

On January 9, 2002, Roger Eckert, City Law Director

-23-

(hereinafter "Law Director"), sent a letter to Preschool (<u>Id</u>.). That letter indicated that pursuant to the Development Agreement, "the City could now require you to install, at your expense, a median in State Route 73 to prevent left turns out of your existing curb cut.  The City also has the option of closing your present curb cut altogether, but at its expense" (<u>Id</u>.).  The letter also indicated that Springboro found the latter alternative to be the safest route (<u>Id</u>.).   Springboro argues that Preschool never constructed a median preventing left turns into and out of its property and never told Springboro that it planned to do so (<u>Id</u>.). As such, Springboro closed the Curb-Cut (<u>Id</u>.).

Preschool maintains that the Development Agreement provides the contractual promise from Springboro to Preschool that upon the development of Preschool's property as planned, Preschool would enjoy direct access to State Route 73 (doc. 18).  Preschool maintains that the catalyst for the Development Agreement was Springboro's initial concerns regarding direct access to the Preschool property (<u>Id</u>.).  As such, Preschool sought to have this access contractually secured (<u>Id</u>.).   Only if the three preconditions arose would Preschool possibly be required to build a median in the middle of State Route 73, asserts Preschool (<u>Id</u>.). If the preconditions were never met, Preschool maintains that it was assured direct access to State Route 73 (<u>Id</u>.).

The Court restates the third precondition as it

-24-

forms the basis of Preschool's argument.

> c. City has caused the then-owner of the Oberer Property to grant a perpetual easement to Owner, or to the public, as the case may be, for vehicular and pedestrian ingress and egress, with title that is free, clear and unencumbered, across such portions of the Oberer Property which are shown on attached Exhibit C on such terms as are reasonably acceptable to Owner and that do not contain any obligation on the part of Owner to maintain, pay for maintenance or to insure any portions of the Oberer Property.

(doc. 24). Preschool maintains that the third condition was and has never been met (doc. 43). Preschool argues that title to the Easement is not "free, clear and unencumbered" (Id.). The Easement, at the time the alleged breach occurred, was encumbered by a $2.385 million first mortgage and a $2.56 million second mortgage[1] (Id.). It was also precluded by two written utility easements that allowed for placement of poles and associated structures in the Easement area and also for obstruction of the area by construction activity (Id.). Additionally, sanitary and storm sewer lines are constructed through the easement (Id.).

Springboro argues that even if the Court were to find that the above listed precondition was not met (i.e, the

---

[1] The Court notes that subsequent to the filing of this litigation an encumbrance upon the easement which was formerly held by Bank One/J.P. Morgan Chase Bank was released as a result of the sale of the adjoining property over which the Easement is located (doc. 55). Consequently, one of the above referenced mortgages has been released. The effect of this release will be addressed later in the Court's Opinion.

Easement is not "free, clear and unencumbered"), it could always, despite the Development Agreement, close the Curb-Cut pursuant to its inherent police powers (doc. 24 <u>citing</u> <u>State of Indiana ex rel.</u> <u>Anderson v. Brand</u>, 303 U.S. 95, 108-09 (1938). Preschool responds stating, "the notion advanced by Springboro that it can unilaterally abrogate its contractual obligations with impunity is as unfounded in law as it is logic" (doc. 43). Springboro latches on to one line in <u>Brand</u> to justify its argument. This line states, "every contract is made subject to the implied condition that is fulfillment may be frustrated by a proper exercise of the police power . . ." <u>Brand</u> at 108-09.

In <u>Brand</u>, the plaintiff was a public school teacher with contractual rights pursuant to a statute. <u>Id</u>. When the school allegedly breached the plaintiff's employment contract it claimed that the rights granted via the statute had been amended by subsequent legislative action. <u>Id</u>. Additionally, the plaintiff in <u>Brand</u> sought injunctive relief not monetary damages. <u>Id</u>. The instant matter is easily distinguished. Here the alleged breach of the Development Agreement was not the result of legislative enactment, but rather simply consisted of Springboro's physical elimination of the Curb-Cut. Springboro did not pass an ordinance restricting ingress/egress to and from properties along State Route 73, interfering with the Development Agreement in the way contemplated by <u>Brand</u>. Furthermore, Preschool does not seek the

-26-

re-opening of the Curb-Cut; but, rather, it seeks monetary damages.

Brand has never been cited by a published Sixth Circuit opinion. Additionally, those cases which have positively referenced Springboro's interpretation of Brand have done so where some type of legislative enactment was involved which interfered with contractual rights. See e.g., Pavone v. Louisiana State Bd. of Barbers Examiners, 364 F.Supp. 961 (E.D. La. 1973) (involving statutes regulating the barbering and hairdressing professions) and Veix v. Seneca Bldg. & Loan Ass'n of Newark, 19 A.2d 219 (N.J. 1941). Accordingly, Springboro's argument that it can breach the Development Agreement, with impunity, based solely upon its inherent police powers is faulty.

If the conditions are fulfilled, Springboro argues that the Development Agreement creates a right belonging to the city of Springboro to require Preschool to build, at its own expense, a median (doc. 46). The Development Agreement does not, avers Springboro, require it to do anything nor restrict it from doing something (Id.). Rather, the only obligation, contends Springboro, is one placed upon Preschool to build a median, if the City requests it to do so (Id.). At most, Springboro argues that the alleged defects in the Easement and consequent failure to meet the preconditions serve to preclude Preschool from constructing a median at Preschool's expense (Id.). Following this line of argument, Springboro concludes that the closing of the Curb-Cut

-27-

cannot constitute a breach of the Development Agreement, since no obligation not to close the Curb-Cut is created under the language of the Development Agreement.

The Court has thoroughly read the Development Agreement. The Development Agreement specifically states, "[i]f the property is developed according to the Development Plan, then upon completion of the improvements as set forth in the Development Plan, Owner may construct and maintain a driveway to provide access from State Route 73 . . . to its parking lot as shown . . ." As previously noted, the Parties do not dispute that the property was developed according to the Development Plan. Under the Development Agreement, once the property was so developed, Preschool could construct and maintain a driveway from its parking lot to State Route 73 allowing accessibility by both right and left turns. Only upon satisfaction of the preconditions (already thoroughly discussed) might Preschool be required to construct the median.

A "four corners" reading of the Development Agreement does not render the interpretation that Springboro seeks - specifically, that its only obligation under the Development Agreement is to require or not Preschool's construction of a median, provided all preconditions are met. Clearly the Development Agreement permits Preschool to maintain its ingress/egress to State Route 73 so long as the preconditions are *not* met. Springboro can invoke its inherent police powers, as it

-28-

did in this case, but that invocation will not save it from a possible breach of the Development Agreement. What now must be decided is whether a breach did in fact occur. The issue of the Easement and whether it is "free, clear and unencumbered" is essential in determining whether a breach occurred. As noted above, the parties assert that this is a factual determination for the Court to decide and have requested the Court to do so.

Springboro argues that the Easement is a public street because of the dedication and acceptance thereto by Springboro (doc. 37). However, Preschool notes the Easement at issue is owned in fee simple by an unrelated third party (doc. 47). Regardless of whether the Easement is in fact a public street, encumbrances still remain that violate condition 3. Preschool highlights that the Easement could be terminated without the knowledge or consent of Preschool (doc. 18). Additionally, the Easement is not appurtenant to the Preschool Property and, as such, not enforceable by Preschool. The parties agreed in July 2002 that the Easement was encumbered by two mortgages totaling more than $5 million,[2] two utility easements, and two unrecorded easements for sanitary and storm sewer purposes (doc. 64). Preschool notes that the Easement has not been improved to the standards of a public street (Id.).

---

[2] See fn. 1, supra. The Court notes that this release of the primary mortgage does not alter its analysis, as the Easement is still sufficiently encumbered to violate condition 3.

-29-

Just how secure is this Easement in guaranteeing access to and from Preschool's property? As argued at the Hearing by Preschool, at any given moment the utility companies could block entrance to Preschool's property without ever having to consult with Preschool (presumably the utility companies would make arrangements with the adjoining property owner, however). Also, as noted by Preschool, it has no right to place signage along the Easement notifying potential patrons that this is the way to access the preschool/daycare. Additionally, Preschool has no right to enforce the upkeep of the Easement nor could it prevent the property owner over which the Easement runs from altering it. As much as Springboro wishes that the Easement were not encumbered, it simply is not.

Furthermore, the Parties have requested this Court to make a factual determination regarding this matter. This request appears both in the Motions of the Parties and was made during a Status Conference. In order for the factual determination to be made, the Court must review the Parties' expert reports. The Court agrees with the conclusion of Preschool's experts that the Easement is encumbered so as to cause Preschool not to have assured, perpetual vehicular access to and from the property by means of a public street. The Court also finds counsel for Springboro's testimony at the Hearing helpful. In asking Springboro's counsel whether he would advise a client to purchase

-30-

property similarly situated as Preschool's, he responded that he would not.

Accordingly, the Court finds that Preschool is in breach of the Development Agreement. In reaching that conclusion, it has determined (as requested by the parties) that the Easement is not sufficiently free of encumbrances, as required by precondition 3. As such, the Court grants Summary Judgment as it relates to Preschool's claim that Springboro breached the Development Agreement.

## 2. The Forbearance Agreement

Springboro moves this Court to grant Summary Judgment in its favor, regarding the Forbearance Agreement, because it maintains the agreement is not a valid and binding contract between it and Preschool (doc. 24). Springboro does not deny that a series of phone calls and correspondence in 2002 between counsel for Preschool, Christopher P. Finney (hereinafter "Finney") and Eckert, partner in the law firm of Sprinboro's Law Director, were made (Id.). Of extreme relevance is a letter from Eckert to Finney dated May 24, 2002 (hereinafter the "Letter"). Preschool alleges that in the Letter Springboro agreed "not to eliminate the direct access drive to State Route 73 during the construction scheduled for the summer" (Id.).

Springboro agrees that the Letter states exactly

this (Id.).  However, Springboro avers that Eckert was only in a position to "give advice" to Springboro; it was not his job to actually make decision for Springboro (Id.).  Citing Shampton v. Shampton, 789 N.E.2d 883 (Ohio 2003), Springboro argues that under Springboro Charter and Ohio law only City Council could bind Springboro to such an agreement (Id.).

In Shampton, the Springboro City Manager (hereinafter "City Manager") signed a long-term lease agreement with Michael Shampton (hereinafter "Shampton"), a restauranteur, to operate a restaurant in the Springboro Municipal Golf Course. Shampton at 884.  The lease agreement listed a proposed lease term of fifteen years with a three-year renegotiation provision.  Id. at 884-85.  The lease agreement was quite involved, containing thirty numbered paragraphs, but was not signed.  Id. at 885.  The City Manager and Shampton were ultimately unable to consummate the long-term lease agreement.  Id.  The City Manager then requested that Springboro City Council pass a resolution authorizing the City Manager to enter into a short-term lease agreement with Shampton. Id.  A resolution was passed which included specific details regarding the short-term lease as well as authorized the City Manager to enter into the short-term lease with Shampton.  Id. Shampton closed another restaurant he had been running and invested

substantial sums of money in the golf course restaurant.  <u>Id</u>. at
886.  Ultimately, a disagreement arose concerning the payment of
property taxes by Shampton and the City Manager notified Shampton
that Springboro was ending its short-term lease with him.  <u>Id</u>.

Shampton subsequently filed suit against Springboro
claiming a breach of the long-term lease agreement.  <u>Id</u>.  The
threshold issue considered by the Supreme Court was "whether the

City Manager . . . had authority under the Springboro Municipal
Charter and Resolution . . . to bind the City to a long-term
lease."  <u>Id</u>. at 887.   The Ohio Supreme Court first turned to
Section 6.02 of the Springboro Charter which states, "[t]he Manager
shall have the following powers and duties . . . (i) to arrange,
prepare, and sign contracts, franchises and agreements, in
cooperation with the Village Solicitor/City Attorney, but no such
contracts, franchises or agreements shall be legal until ratified
or authorized by ordinance or resolution of the Council . . ."  <u>Id</u>.

The Ohio Supreme Court then reviewed its prior
holding in <u>Lathrop Co. v. Toledo</u>, 214 N.E.2d 408 (Ohio 1966).
<u>Shampton</u> at 886.  <u>Lathrop</u> stated:

> Many times this court has held that no recovery can be
> had on a contract that is entered into contrary to one or
> more of the legislated requirements . . . a thread
> running through the many cases the court has reviewed is
> that the contractor must ascertain whether the contract
> complies with the Constitution, statutes, charters, and

-33-

> ordinances so far as they are applicable.  If he does
> not, he performs at his peril.

Shampton at 886-87 quoting Lathrop.  The Shampton Court concluded
that the long-term lease was not binding as the Springboro Charter
explicitly stated that the City Manager could not bind the city
until City Council authorized any contract which the City Manager
had entered.  Shampton at 886-87.

Preschool contends that Eckert (rather than the City
Manager) bound Springboro via the Forbearance Agreement from
eliminating the Curb-Cut (doc. 24).  According to the Sprinboro
Charter, the Law Director (here, Eckert in his capacity as a
partner in the law firm of the actual Springboro Law Director), is
the head of the Department of Law (Id.).  Furthermore, the
Springboro Charter provides that "Department Directors . . . shall
be appointed by the Manager" and that these directors are
"administrative officer[s] of the municipality" (Id.).  Springboro
maintains that given the lines of authority, the Law Director
should be subjected to the same restrictions in entering contracts
as the City Manager (Id.).

Since the Ohio Supreme Court's decision in Shampton,
Springboro has amended its Charter to further specify the necessary
requirements for the formation of a valid and binding contract
(Id.).  The application section of the Charter, Section 5.10, now
reads:

-34-

No agreement obligating the Municipality to pay money or undertake debt; or to sell, buy or encumber real or personal property; or to lease real or personal property to or from others; or to accept real or personal property; or to perform any act or refrain from performing any act; or to become obligated for any combination of these; shall be enforceable against the Municipality unless the agreement satisfies the following requirements and formalities, which are mandatory:

a. It has been specifically approved by an ordinance or resolution adopted by the Council, or categorically approved by an ordinance adopted by the Council for inclusion in the Administrative Code for the purposes of facilitating routine transactions.

b. It is in writing, with the date of execution by each signatory separately indicated.

c. It has been executed by the City Manager, or by his designee, under those circumstances in which the City Manager is authorized by ordinance to appoint a designee.

Nothing in this Section shall be construed as preventing the City from performing all or part of an unenforceable contract if in its interest to do so, but neither full or part performance by the City or by any other party shall create any legal or equitable obligation enforceable against the City.

The Council may by ordinance establish additional formalities, rules and procedures controlling the formation of municipal contracts. Nothing in this Section shall prevent the retroactive approval of a contract by the council by ordinance or resolution.

By the publication of this Charter, all persons doing business with the City shall be deemed to have constructive notice of these mandatory limitations on municipal contracting. Such persons have an affirmative duty to assure themselves that all applicable legal requirements have been complied with for the formation of a municipal contract, and failing to do so, assume the

-35-

risk of doing business under an unenforceable contract.
(Id.).

Springboro argues that the Letter does not meet these requirements (Id.). Specifically, no ordinance or resolution approving the Letter was executed by the City Manager or his designee. Springboro also maintains that Preschool cannot argue promissory estoppel (Id.). That issue, avers Springboro, was decided in Shampton (Id.). Shampton stated:

> To be successful on the claim of promissory estoppel, '[t]he party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading.' Persons seeking to enter into a contractual relationship with a government entity are on constructive notice of the statutory limitations on the power of the entity's agent to contract. Since state and local laws are readily available for public review, it is a simple matter for a party to educate itself as to the procedural formalities with which government officials must comply before they may bind a governmental entity to a contract.

Shampton at 887. Shampton also stated, "liability does not attach to the City based on appellees' mistaken interpretation of the resolution." Id. at 888.

Preschool counters, noting that Christine Thompson, Sprinboro's City Manager in May 2002, as well as now, testified in deposition that Eckert, when sending the Letter "was acting within the scope of the authority that the City had delegated to him"

-36-

(doc. 43). Thus, argues Preschool, Springboro, through City Manager Thompson, had authorized the actions of Eckert and, as such, the Letter is binding (Id.). However, the Court is not persuaded by Preschool's position.

The Court notes since 1899 that the Ohio Supreme Court has supported the proposition that "contractors who do not ascertain the authority of government representatives to bind their principals do business with the government at their own peril." System Automation Inc. v. Ohio Dept. of Admin. Servs., 2004 WL 2341693 (Ohio App. 10 Dist., Oct. 19, 2004) citing Buchanan Bridge Co. v. Campbell, 54 N.E. 372 (Ohio 1899). In addition to the System Automation case, the Ohio Ninth Appellate District has also positively cited Shampton and its rationale. Current Source, Inc. v. Elyria City Sch. Dist., 813 N.E.2d 730, 736 (Ohio App. 2004). Despite City Manager Thompson's statement in her deposition testimony, the law in Shampton is clear. Accordingly, the Court finds no issue as to any material fact and that as a matter of law, Springboro is entitled to summary judgment as it pertains to Preschool's claim that Springboro breached the Forbearance Agreement. Accordingly, Preschools claim that Springboro breach the Forbearance Agreement is dismissed.

**D.  Preschool's Contracts Clause Claim**

Preschool also alleged that the elimination of the Curb-Cut violated the Contracts Clause of the United States Constitution (doc. 1). Article 1, Section 10, Clause 1 of the Constitution provides that "[n]o State shall . . . pass any . . . law impairing the obligation of contracts." Springboro maintains that no cause of action under the Contracts Clause corresponds to the facts of this case (doc. 24). When addressing a Contracts Clause claim a court begins its analysis by addressing three questions. An affirmative answer is required for each to establish a violation. Those three questions are:

1. Is there a contractual obligation?

2. Does a change in state law impair the contractual obligation?

3. Is the impairment substantial?

See General Motors, Inc. v. Romein, 503 U.S. 181, 186 (1992). Although the Court would not find in Preschool's favor on this issue, it need not be addressed as Preschool has withdrawn this claim (doc. 43).

However, an argument was made at the Hearing by Preschool that a taking of its property rights in the Development and Forbearance Agreements had occurred pursuant to the Fifth and Fourteenth Amendments. A number of cases have held contract rights to be property rights subject to takings under the Fifth Amendment.

-38-

See e.g., Lynch v. United States, 292 U.S. 571, 579 (1934) (stating "valid contracts are property . . . rights against the United States arising out of a contract with it are protected by the Fifth Amendment"); United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 19 (stating "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); Omnia Commercial Co. v. United States, 261 U.S. 502, 508-09 (1923); and Muhlker v. N.Y. & Harlem R.R. Co., 197 U.S. 544, 570 (1905).  Some of these cases have been cited by Preschool (doc. 64).  Yet, Springboro notes that it has long been settled that a mere breach of contract by the government does not give rise to a constitutional claim (doc. 63 citing Manila Investors Co. v. Trammell, 239 U.S. 31, 36 (1915).

The question for the Court is whether Preschool can claim a takings as a result of the breach of the two agreements or whether it can only maintain a traditional breach of contract claim.  The Court is confronted with cases cited by both parties, cases that offer conflicting viewpoints.  The Court is persuaded by those cases who have concluded that a "breach of contract claim does not give rise to a §1983 constitutional claim."  Boyce v. Augusta-Richmond Cty., 111 F.Supp.2d 1363, 1382 (S.D. Ga. 2000), citing Medical Laundry Servs. v. Bd. of Trustess of the Univ. of Alabama, 906 F.2d 571, 573 (11th Cir. 1990); see also Costello v.

-39-

Town of Fairfield, 811 F.2d 782, 784 (2nd Cir. 1987) ("A contract dispute . . . does not give rise to a cause of action under section 1983"); Boston Env't Sanitation Inspectors Ass'n v. City of Boston, 794 F.2d 12, 13 (1st Cir. 1986) ("[A]n alleged breach of contract does not amount to a deprivation of property without due process actionable under section 1983"); Sudeikis v. Chicago Transit Auth., 774 F.2d 766, 770 (7th Cir. 1985) ("It has long been settled that a mere breach of contract by the government does not give rise to a constitutional claim."); and Jimenz v. Almodovar, 650 F.2d 363, 370 (1st Cir. 1981) ("A mere breach of contractual right is not a deprivation of property without constitutional due process of law . . . Otherwise virtually every controversy involving an alleged breach of contract by a government or a governmental institution or agency or instrumentality would be a constitutional case.").

Here is a litany of cases whose holdings are contrary to Preschool's argument. Recently, a Sixth Circuit opinion, B&B Trucking, Inc. v. U.S.P.S., No. 02-1562, 2005 WL 976981 (6th Cir., Dec. 8, 2004), has held similarly. Id. at *2. As such, the Court denies Preschool's Motion for Summary Judgment as it pertains to this issue and, in so doing, grants Springboro's Motion for Summary Judgment as to this issue. Consequently, as a matter of law, Preschool's claim based on a taking of its contractual rights under both the Development and Forbearance Agreements is dismissed.

-40-

**CONCLUSION**

In conclusion, the Court GRANTS and DENIES IN PART both Parties' Motions for Summary Judgment (docs. 18 and 24). Specifically, the Court GRANTS Preschool's Motion for Summary Judgment on its Fifth Amendment Property Takings Claim leaving only the need to determine appropriate damages for this compensable taking. In so GRANTING, the Court DENIES Springboro's Motion for Summary Judgment on this issues. The Court GRANTS Preschool's Motion for Summary Judgment on its breach of the Development Agreement again leaving only the need to determine appropriate damages. In so doing, it DENIES Springboro's Motion for Summary Judgment on this issue. The Court GRANTS Springboro's Motion for Summary Judgment as it relates to Preschool's claim that Springboro breached the Forbearance Agreement. As a result, this claim of Preschool's is DISMISSED. Lastly the Court GRANTS Springboro's Motion for Summary Judgment on Preschool's Contract Clause claim/Contractual Rights Taking claims. Accordingly, this Claim of Preschool's is also DISMISSED.

SO ORDERED.


Dated: May 4, 2005          s/S. Arthur Spiegel
                            _____

                            S. Arthur Spiegel
                            United States Senior District Judge


-41-